United States District Court
For the Northern District of California

IN THE UNITED STATES DISTRICT COURT

FOR THE NORTHERN DISTRICT OF CALIFORNIA

MATSUNOKI GROUP, INC., dba HAIKU HOUSES,

    Plaintiff,

  v.

TIMBERWORK OREGON, INC.; TIMBERWORK, INC.; JOAN L. SHUELL; EARL MAURY BLONDHEIM; DON PAUL; ILENE ENGLISH-PAUL and DOES 1 through 10, inclusive,

    Defendants.

                              /

No. C 08-04078 CW

ORDER GRANTING DEFENDANTS' MOTION FOR SUMMARY JUDGMENT

This is a copyright and trademark infringement case about custom-built Japanese pole-style houses. Plaintiff Matsunoki Group, Inc., doing business as Haiku Houses, brings claims against Defendants Timberwork, Inc.,[1] Earl M. Blondheim, Don Paul and Ilene English-Paul for copyright, trademark and trade dress infringement, false designation of origin and unfair competition.[2] Defendants Timberwork and Blondheim move for summary judgment on all claims brought against them. Defendants Don Paul and Ilene English-Paul did not join in the motion. Matsunoki opposes the motion. The

---

[1] Timberwork, Inc. and Timberwork Oregon, Inc. were named as separate Defendants, but they are the same company.

[2] The Court previously dismissed the claims against Joan Schuell for lack of personal jurisdiction. See Docket No. 59.

motion was taken under submission on the papers.  Having considered all of the papers filed by the parties[3] the Court grants Defendants' motion.

BACKGROUND

Although the history of Japanese pole-style houses traces back centuries, the relevant history of this case goes back to 1973.  In that year, an individual named Gordon Steen began a business called Pole House Kits of California.  With that business, Steen developed plans, designs, specifications and materials for the construction of pole houses which emulated sixteenth century Japanese farmhouses.  Steen designed these replicas of Japanese farmhouses based on those he had seen forty years earlier while serving with the U.S. Air Force.

In 1985, Pole House Kits of California published a catalogue entitled, "Haiku Houses Country Houses of 16th Century Japan."  In 1988, Thomas Newcomer, a businessman who worked in the same building as Steen, approached Steen about the prospect of acquiring Pole House Kits of California.  Newcomer created a company called World Classic Houses, Inc., and that company merged with Pole House Kits.  Steen licensed to World Classic Houses an exclusive right to use the designs, creations, inventions, blueprints, working drawings, marketing data, plans and all data necessary to the design, manufacture, installation and sale of custom houses in the style of country homes of sixteenth century Japan.  These uses were

---

[3]The Court grants Plaintiff's motion for leave to file a surreply and grants Defendants' motion for leave to file a reply to Plaintiff's surreply.

2

referred to as the "Technology" in the license agreement. In exchange for the license, Steen earned royalties based on a percentage of World Classic Houses' gross revenue and a monthly consulting fee.

In 1989, World Classic Houses published a catalogue entitled, "Haiku Houses Country Houses of 16th Century Japan." The catalogue is almost identical to the 1985 catalogue except that the 1989 version includes floor plans for an additional design, the "Nara Countryhouse," and it omits a small picture of a Japanese shrine from the second page.

World Classic Houses was not successful and, in 1991, Newcomer closed the business. When he closed the business, Newcomer and Steen dissolved the license agreement but Steen allowed Newcomer to retain the right to use the "Haiku Houses" name and Steen's materials for the completion of several unfinished housing projects. Newcomer Decl., ¶ 12.[4] It appears that Steen retained the rights to all of the technology previously licensed to Newcomer; section 6.02(c) of the license agreement states that "the Technology shall revert to" Steen if Newcomer failed to "achieve $1,000,000 in gross revenues for any two (2) consecutive fiscal years." Newcomer Decl., Exh. A at 6.

In July, 1994, Steen registered the trademark, "HAIKU HOUSES COUNTRY HOUSES OF 16TH CENTURY JAPAN." Pardini Decl., Exh. G. In

---

[4] To the extent that the Court relied upon evidence to which Defendants objected, the objections are overruled. The Court did not rely on any inadmissible evidence in reaching its decision. To the extent the Court did not rely on evidence to which Defendants objected, the objections are overruled as moot.

3

June, 1995, Steen organized Haiku Houses Limited, a California Corporation. Id., Exh. H. In 1996, Haiku Houses Limited published a catalogue entitled, "Haiku Houses Country Houses of 16th Century Japan." Plaintiff claims that this catalogue "was radically different from the 1989 Catalogue." Opposition at 4. The 1996 catalogue included a different inside front cover design and text, several of the photographs were new, some of the text in the catalogue was changed, a few of the design drawings were slightly altered and plans for five new houses were included.

Between 1995 and 1997, Haiku Houses Limited became indebted to Defendant Timberwork, Inc. for $71,026.98 for failing to pay for building materials. Timberwork provides specialty building materials to individuals and contractors who custom-build Japanese pole-style houses. Defendant Blondheim is the founder and president of Timberwork. Timberwork had worked with Steen since its inception in 1988. In June, 1997, Haiku Houses Limited and Timberwork signed a security agreement and promissory note putting up all of Haiku Houses Limited's business assets, including plans, designs, trade names, customer lists, and "general intangibles including but not limited to trade names, trademarks, service marks and intellectual property rights . . ." as security for the debt. Blondheim, Exh. A. Haiku Houses Limited and Steen failed to make any payments to Timberwork on this debt and, thus, they defaulted on the note.

On April 3, 1998, Timberwork assigned its interest in the security agreement and promissory note to Alvin Byrd for $100,000. The assignment required an initial payment of $25,000 on the date

4

of the assignment, an additional payment of $25,000 due on May 22, 1998, and the remaining payment of $50,000 due on June 22, 1998. The assignment noted that it "shall be binding upon and inure to the benefit of the parties hereto, their heirs, successors, and assigns." Id., Exh. B. Byrd made the initial payment on the date of the assignment. On May 15, 1998, Byrd sold the Haiku Houses Limited assets to Landmark Architecture and Design for $60,000. Pardini Decl., Exh. I. Believing that Byrd and Landmark were related companies, Timberwork sent them letters to collect the remaining money due under the April 3, 1998 agreement. Timberwork claims that neither Byrd nor Landmark paid it any of the remaining money owed for the Haiku Houses Limited assets. Blondheim Decl., ¶ 7.

Timberwork claims that, in June, 2000, it "began displaying on its website a trademark similar to the Haiku Trademark." Motion at 4. On February 19, 2001, Landmark's attorney sent a letter to Blondheim claiming that Timberwork's website contained infringing photographs and that it infringed the Haiku Houses trademark. The letter provided, in relevant part,

> Our client has recently become aware that Timberwork Oregon is currently utilizing the name "Haiku Houses" and photographs which are owned by and depict the Haiku House homes constructed by our client or its predecessors on and in connection with its Internet website [www.timberwork.com/houses.html] in violation of our client's rights. The use of the trademark, name and/or photographs in connection with this or any website violates Federal and state trademark statutes, the U.S. copyright laws and our client's legal rights under common law and unfair competition law.

Blondheim Decl., Exh. D. On February 27, 2001, Blondheim responded,

5

> Please be advised that the intellectual property rights to Haiku Houses were sold to Alvin Byrd incorporated on April 3, 1998 with the provision that the amount due would be paid by June 22, 1998. Since payment was not received and Alvin Byrd Incorporated was in default, these rights remained in my possession.
>
> Kindly advise your client that he does not own Haiku Houses and should desist from using their catalogs, drawings, trademarks or name in marketing his product.

Blondheim Decl., Ex. E.

Landmark did not respond to Blondheim's letter. Charla Honea, the President of Plaintiff Matsunoki Group, Inc., claims that, at some point after Byrd sold Haiku Houses Limited's assets to Landmark, "Landmark ultimately changed its corporate name to Matsunoki Group, Inc. d/b/a Haiku Houses and assigned all of its assets to Matsunoki." Honea Decl., ¶ 3. Honea does not state when the name change and transfer occurred; however, Matsunoki was not registered as a corporation in Tennessee until May 12, 2004.

Blondheim claims that, despite the exchange of letters mentioned above, "Timberwork and Landmark, and later Timberwork and Matsunoki, enjoyed a cordial working relationship where Matsunoki marketed haiku houses and Timberwork provided the information, drawings, technical data and products necessary to build them." Blondheim Decl. ¶ 10. Blondheim alleges that, "up until the filing of this lawsuit, Timberwork continued to use a similar trademark and the Haiku Houses product catalog without comment or objection by Landmark or Matsunoki." Id. at ¶ 11.

In this lawsuit, Matsunoki alleges six causes of action: copyright infringement, trademark infringement, common law trademark infringement, false designation of origin under the

6

1 Lanham Act, trade dress infringement under the Lanham Act and
2 violation of California's unfair competition law.

3   On May 13, 2004, Matsunoki registered copyrights for four
4 different catalogs of house plans, each entitled, "Haiku Houses
5 Country Houses of 16th Century Japan."  The first catalogue was the
6 one published by World Classic Houses on June 15, 1989; the second
7 was published on June 15, 1994; the third on June 15, 1996; and the
8 fourth on June 15, 1999.  Also on May 13, 2004, Matsunoki
9 registered its website, which was first published on November 15,
10 1999.  On August 10, 2004, Matsunoki registered copyrights for two
11 Haiku Houses Builder's Guides, published on June 15, 1996 and
12 November 1, 2001 respectively.

13                          LEGAL STANDARD

14   Summary judgment is properly granted when no genuine and
15 disputed issues of material fact remain, and when, viewing the
16 evidence most favorably to the non-moving party, the movant is
17 clearly entitled to prevail as a matter of law.  Fed. R. Civ. P.
18 56; Celotex Corp. v. Catrett, 477 U.S. 317, 322-23 (1986);
19 Eisenberg v. Ins. Co. of N. Am., 815 F.2d 1285, 1288-89 (9th Cir.
20 1987).

21   The moving party bears the burden of showing that there is no
22 material factual dispute.  Therefore, the court must regard as true
23 the opposing party's evidence, if supported by affidavits or other
24 evidentiary material.  Celotex, 477 U.S. at 324; Eisenberg, 815
25 F.2d at 1289.  The court must draw all reasonable inferences in
26 favor of the party against whom summary judgment is sought.
27 Matsushita Elec. Indus. Co. v. Zenith Radio Corp., 475 U.S. 574,

28                                 7

587 (1986); <u>Intel Corp. v. Hartford Accident & Indem. Co.</u>, 952 F.2d 1551, 1558 (9th Cir. 1991).

Material facts which would preclude entry of summary judgment are those which, under applicable substantive law, may affect the outcome of the case. The substantive law will identify which facts are material. <u>Anderson v. Liberty Lobby, Inc.</u>, 477 U.S. 242, 248 (1986).

Where the moving party does not bear the burden of proof on an issue at trial, the moving party may discharge its burden of production by either of two methods:

> The moving party may produce evidence negating an essential element of the nonmoving party's case, or, after suitable discovery, the moving party may show that the nonmoving party does not have enough evidence of an essential element of its claim or defense to carry its ultimate burden of persuasion at trial.

<u>Nissan Fire & Marine Ins. Co., Ltd., v. Fritz Cos., Inc.</u>, 210 F.3d 1099, 1106 (9th Cir. 2000).

If the moving party discharges its burden by showing an absence of evidence to support an essential element of a claim or defense, it is not required to produce evidence showing the absence of a material fact on such issues, or to support its motion with evidence negating the non-moving party's claim. <u>Id.</u>; see also <u>Lujan v. Nat'l Wildlife Fed'n</u>, 497 U.S. 871, 885 (1990); <u>Bhan v. NME Hosps., Inc.</u>, 929 F.2d 1404, 1409 (9th Cir. 1991). If the moving party shows an absence of evidence to support the non-moving party's case, the burden then shifts to the non-moving party to produce "specific evidence, through affidavits or admissible discovery material, to show that the dispute exists." <u>Bhan</u>, 929

8

1  F.2d at 1409.

2  If the moving party discharges its burden by negating an
3  essential element of the non-moving party's claim or defense, it
4  must produce affirmative evidence of such negation. Nissan, 210
5  F.3d at 1105. If the moving party produces such evidence, the
6  burden then shifts to the non-moving party to produce specific
7  evidence to show that a dispute of material fact exists. Id.

8  If the moving party does not meet its initial burden of
9  production by either method, the non-moving party is under no
10 obligation to offer any evidence in support of its opposition. Id.
11 This is true even though the non-moving party bears the ultimate
12 burden of persuasion at trial. Id. at 1107.

13 Where the moving party bears the burden of proof on an issue
14 at trial, it must, in order to discharge its burden of showing that
15 no genuine issue of material fact remains, make a prima facie
16 showing in support of its position on that issue. UA Local 343 v.
17 Nor-Cal Plumbing, Inc., 48 F.3d 1465, 1471 (9th Cir. 1994). That
18 is, the moving party must present evidence that, if uncontroverted
19 at trial, would entitle it to prevail on that issue. Id. Once it
20 has done so, the non-moving party must set forth specific facts
21 controverting the moving party's prima facie case. UA Local 343,
22 48 F.3d at 1471. The non-moving party's "burden of contradicting
23 [the moving party's] evidence is not negligible." Id. This
24 standard does not change merely because resolution of the relevant
25 issue is "highly fact specific." Id.
26 //
27 //
28

9

DISCUSSION

I.  Copyright Infringement

"In order to establish infringement, two elements must be proven: (1) ownership of a valid copyright, and (2) copying of constituent elements of the work that are original." Rice v. Fox Broadcasting Co., 330 F.3d 1170, 1174 (9th Cir. 2002). Defendants argue that Matsunoki cannot prove that it owns these copyrights. Matsunoki argues that it has obtained ownership to these rights through assignments. A transfer of copyright ownership is not valid "unless an instrument of conveyance, or a note or memorandum of transfer, is in writing and signed by the owner of the rights conveyed." 17 U.S.C. § 204(a).

Matsunoki provides documentation to trace the chain of title to the copyrights up to their sale to Landmark on May 15, 1998. Honea claims that then "Landmark ultimately changed its corporate name to Matsunoki Group, Inc. d/b/a Haiku Houses and assigned all of its assets to Matsunoki." Honea Decl. ¶ 3. Matsunoki has not produced a written assignment to support this assertion. The only evidence submitted shows that Matsunoki and Landmark are two distinct corporate entities. Tennessee Secretary of State Records show that Landmark was incorporated on March 23, 1998 and was administratively dissolved on November 6, 2006. Pardini Decl., Exh. L. Matsunoki was incorporated on May 12, 2004 and is still an active corporate entity. These records do not indicate that Landmark ever changed its name or transferred its assets to Matsunoki.

Matsunoki argues that it "need not produce an executed

10

1 assignment document for an assignment of the copyrights to be
2 effective." Opposition at 11. However, Matsunoki relies for this
3 assertion upon cases that hold that a copyright transfer need not
4 be recorded in the U.S. Copyright Office when such rights are
5 acquired through a corporate merger. See 17 U.S.C. § 205; Forry v.
6 Neundorfer, 837 F.2d 259, 262 (6th Cir. 1988); Raffoler v. Peabody,
7 671 F. Supp. 947, 952 n.2 (E.D.N.Y. 1987). These cases do not
8 stand for the proposition that assignments do not have to be
9 written. Nor has Matsunoki presented any evidence of its alleged
10 corporate merger with Landmark. Rather, Matsunoki and Landmark are
11 two separate and distinct companies.

12   Matsunoki argues in the alternative that a signed written
13 transfer of the registered copyrights is not needed because it
14 holds common law copyrights in the works at issue. However, 17
15 U.S.C. § 301 preempts all common law copyright claims arising after
16 January 1, 1978, with no exceptions relevant to this case. Because
17 Matsunoki does not assert that any of its alleged copyright claims
18 arose before 1978, it cannot rely upon common law copyrights.

19   In its surreply, Matsunoki appears to abandon its arguments
20 that a writing is not required, that Landmark and Matsunoki merged,
21 and that Landmark had already assigned its assets to Matsunoki.
22 Instead, Matsunoki argues that its president, Ms. Honea, plans to
23 take future action to reinstate Landmark as a corporation and then
24 cause it to assign its assets to Matsunoki. Matsunoki claims that
25 when Landmark administratively dissolved on December 17, 1999, its
26 assets passed to its sole shareholder, Honea. In a declaration
27 signed on January 6, 2010, Honea states that she would apply to the

11

1 Tennessee Secretary of State for reinstatement of Landmark on
2 January 7, 2010.  Once that reinstatement becomes effective, "it
3 relates back to and takes effect as of the effective date of the
4 administrative dissolution, and the corporation resumes carrying on
5 its business as if the administrative dissolution had never
6 occurred."  Tenn. Code Ann. § 48-24-203(c).  Honea claims that "as
7 soon as the Secretary reinstates Landmark, I will make an official
8 assignment of the Haiku Houses Assets to Matsunoki."  Honea Decl.
9 ¶ 3.  Because Honea plans to assign the assets in the future,
10 Matsunoki claims that the fact that Matsunoki and Landmark are
11 different corporate entities is "a distinction without a
12 difference."  The Court disagrees.

13 Applying for reinstatement is not the same thing as being
14 reinstated.  Honea must satisfy the Tennessee Secretary of State
15 that Landmark has met the requirements for reinstatement under
16 Tennessee Code Annotated section 48-24-203(a), which include
17 obtaining "a certificate from the commissioner of revenue reciting
18 that the corporation has properly filed all reports and paid all
19 taxes and penalties required by the revenue laws of this state."
20 Honea has made no showing that she has met these reinstatement
21 requirements.  Because Matsunoki presents no evidence that it
22 currently owns the copyrights at issue, and it is not clear when
23 and if it will obtain those copyrights by assignment, the Court
24 concludes that Matsunoki cannot bring any claims for copyright
25 infringement.  Therefore, Matsunoki's copyright claims fail.

II. Trademark Infringement

Defendants argue that Matsunoki's trademark infringement claim

12

is barred by laches. "This defense embodies the principle that a plaintiff cannot sit on the knowledge that another company is using its trademark, and then later come forward and seek to enforce its rights." Internet Specialties West, Inc. v. Milon-Didiorgio Enterprises, Inc., 559 F.3d 985, 989-90 (9th Cir. 2009). The test for laches is two-fold: "first, was the plaintiff's delay in bringing suit unreasonable? Second, was the defendant prejudiced by the delay?" Id. at 990. The trademark statute does not contain a limitations period. However, a presumption of laches applies if a trademark infringement lawsuit is filed outside of the statute of limitations for the most analogous cause of action at state law. Id. at 990-91; Jarrow Formulas, Inc. v. Nutrition Now, Inc., 304 F.3d 829, 835 (9th Cir. 2002). The parties agree that the four-year limitations period from California trademark infringement law is the most analogous. Here, Matsunoki does not dispute that it waited seven years from that time the cause of action first arose in 2001 to the time it filed suit in 2008. Therefore, the presumption applies.

Matsunoki first argues that the delay in question only applies to Matsunoki's common law claim of trademark infringement regarding the name "Haiku Houses" because the cease and desist letter Matsunoki sent to Timberwork on February 19, 2001 only referred to Timberwork's use of that mark. Matsunoki claims that it was not aware at that time that Timberwork was also infringing its registered trademark for the name "Haiku Houses." However, the cease and desist letter was more broadly written than Matsunoki claims. The letter specifically notes that the "use of the

13

1  trademark, name and/or photographs in connection with this or any
2  website violates Federal and state trademark statutes, the U.S.
3  copyright laws and our client's legal rights under common law and
4  unfair competition law."  Blondheim Decl., Exh. D.  Therefore,
5  Matsunoki's letter addresses the trademark rights at issue in this
6  case.
7      Matsunoki argues that the seven-year wait was reasonable
8  because litigation wasn't worthwhile until it "recently" learned
9  that Defendants were allegedly stealing its clients.  Honea Decl.
10 ¶ 15.  In essence, Matsunoki argues that Defendants' actions were
11 not threatening enough to require litigation.  This argument has no
12 merit.  A trademark holder is not entitled to wait until an
13 infringer grows large enough to "constitute a real threat" before
14 suing for trademark infringement.  <u>Internet Specialties</u>, 559 F.3d
15 at 991.  The seven-year delay in bringing suit is evidence of
16 Matsunoki's lack of diligence in enforcing its mark.
17     Matsunoki also argues that the delay was reasonable because a
18 only delays lasting "decades" are unreasonable.  For support,
19 Matsunoki cites <u>Danjaq v. Sony Corp.</u> 263 F.3d 942, 952 (9th Cir.
20 2001), which holds that a delay of nineteen years is "more than
21 enough" to support a laches defense.  However, <u>Danjaq</u> did not set
22 nineteen years as the lower threshold for laches.  In fact, in
23 <u>Internet Specialties</u>, the Ninth Circuit held that a delay of seven
24 years was unreasonable, and in <u>Grupo Gigante v. Dallo & Co.</u>, 391
25 F.3d 1088, 1101-1105 (9th Cir. 2004), the court upheld a finding
26 that a delay of only four years was sufficient to bar an
27 infringement claim.  Therefore, the Court concludes that

**United States District Court**
For the Northern District of California

14

1 Matsunoki's delay in bringing suit was unreasonable.

2 Defendants must still satisfy the second prong of the laches
3 test: prejudice resulting from Matsunoki's unreasonable delay in
4 bringing suit. "Courts have recognized two main forms of prejudice
5 in the laches context -- evidentiary and expectations-based."
6 Danjaq, 263 F.3d at 955. Defendants have undisputed evidence of
7 both of these types of prejudice.

8 "Evidentiary prejudice includes such things as lost, stale, or
9 degraded evidence, or witnesses whose memories have faded or who
10 have died." Id. One of the most important witnesses in this case,
11 Gordon Steen, died in 2004. Honea Decl. ¶ 2. Matsunoki asserts
12 that Steen authored the intellectual property at issue in this
13 case, an assertion Defendants strongly dispute. Without the
14 opportunity to cross examine Steen, Defendants' ability to defend
15 themselves will be hamstrung. Steen is clearly the best source for
16 information about the manner in which the intellectual property in
17 question was authored and transferred. If Matsunoki had not
18 delayed in bringing the suit, it could have tried this case before
19 Steen's death, or his testimony could have at least been preserved
20 in some fashion. Therefore, the Court concludes that Matsunoki's
21 delay has caused Defendants evidentiary prejudice.

22 A defendant may demonstrate expectation prejudice "by showing
23 that it took actions or suffered consequences that it would not
24 have, had the plaintiff brought suit promptly." Danjaq, 263 F.3d
25 at 955. After Matsunoki did not respond to Timberwork's February
26 27, 2001 letter asserting Timberwork's rights to the intellectual
27 property, Timberwork continued to use the mark in its catalogs,

15

promotional material and websites and has built its business in reliance on the marks. See e.g., Blondheim Decl. ¶¶ 10-11. It would be inequitable to permit Matsunoki to wait seven years before bringing suit and then profit from Defendants' successes.

Matsunoki finally argues that, because laches does not bar a suit against a willful infringer, and because Defendants committed a willful infringement, laches does not apply. Danjaq, 263 F.3d at 956. "'Willful' refers to conduct that occurs 'with knowledge that the defendant's conduct constitutes copyright infringement.'" Id. at 957 (quoting Columbia Pictures Television v. Krypton Broad,, 106 F.3d 284, 293 (9th Cir. 1997). The Ninth Circuit applies the same principles in the trademark arena. Id. (citing Nat'l Lead Co. v. Wolfe, 223 F.2d 195, 202 (9th Cir. 1955). Matsunoki has failed to present evidence that Defendants willfully infringed its rights. Defendants' written response to Matsunoki's cease and desist letter, in which Defendants claimed ownership of the intellectual property, in addition to the seven uninterrupted years during which they used the marks, demonstrates that Defendants did not commit a willful infringement. Accordingly, the laches defense applies to bar Matsunoki's trademark claims.

In sum, the Court grants Defendants' summary judgment motion on Matsunoki's copyright claims because Matsunoki cannot prove ownership of the copyrights at issue and the Court grants Defendants' summary judgment motion on Matsunoki's trademark claims because the equitable doctrine of laches bars these claims. Each

16

of Matsunoki's claims against the moving Defendants is dismissed.[5] Because Matsunoki's claims against Defendants Don Paul and Ilene English-Paul are based on the same facts and legal theories as its claims against the moving Defendants, its claims against Don Paul and Ilene English-Paul are summarily adjudicated against it as well. See Abigninin v. AMVAC Chemical Corp., 545 F.3d 733, 742-43 (9th Cir. 2008); Columbia Steel Fabricators, Inc. v. Ahlstrom Recovery, 44 F.3d 800, 802 (9th Cir. 1995); Silverton v. Dep't of Treasury, 644 F.2d 1341, 1345 (9th Cir. 1981).

## CONCLUSION

For the foregoing reasons, the Court grants Defendants' motion for summary judgment (Docket No. 70).  The Court grants Plaintiff's motion for leave to file a surreply (Docket No. 105) and grants Defendants' motion for leave to file a reply to Plaintiff's surreply (Docket No. 107).  Defendants shall recover their costs from Plaintiff.

IT IS SO ORDERED.

Dated: 4/16/10

CLAUDIA WILKEN
United States District Judge

---

[5] This includes Matsunoki's false designation or origin, trade dress and unfair competition claims, which are derivative of its copyright and trademark claims.

17